## MATCHETTE v. STREETER BROS.

(Circuit Court, N. D. Illinois, E. D. August 15, 1910.)

No. 29,094.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—VACUUM CLEANING APPARATUS.

The Matchette and Raddatz patent, No. 870,981, for a vacuum cleaning apparatus, has as one element of the combination an automatic governor adapted to open and close the pressure supply connection which has a positive "on and off" action, and was not anticipated in the prior art, and the combination with such novel and useful element discloses patentable invention, although the other elements are old; also, held infringed.

2. PATENTS (§ 247*)—INFRINGEMENT—USE OF IMPROVED DEVICE.

Where a patented combination is operative in itself, infringement is not avoided by the use with it of an auxiliary device which increases its efficiency.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 388; Dec. Dig. § 247.*]

---

In Equity. Suit by Frank J. Matchette against Streeter Bros., a corporation. On final hearing. Decree for complainant.

Brown & Williams, for complainant.

John H. Miller, T. D. Merwin, and Munday, Evarts, Adcock & Clarke, for defendant.

SANBORN, District Judge. Suit for infringement of letters patent 870,981, for a vacuum cleaning system, applied for January 15, 1906, issued November 12, 1907, to complainant and Richard Raddatz, assignor to complainant. Defendant's system, claimed to infringe the patent, was installed by the Sanitary Devices Manufacturing Company, a California corporation, in March, 1907. The suit is being defended by that corporation, and was brought May 11, 1908. One of the claims follows:

"9. In a vacuum cleaning apparatus, the combination of a suction main having a valve controlled inlet connection, an aspirator communicating with and adapted to exhaust air from said main and having a fluid pressure supply connection, and an automatic governor adapted to open and close said pressure supply connection according to variations of vacuum in the system; substantially as described."

Nothing new is claimed for the suction main, controller valve, or aspirator with its fluid pressure supply; but an automatic governor which will entirely open and entirely close the pressure supply according to variations of vacuum in the system is new. If the governor described in the patent specifications and drawings will do this, the combination is novel and useful. If it will not, both the elements and combination are old, being unmistakably present in the Bavier and Hawkes patent of 1900, No. 658,103, and other structures of the prior art. In other words, if an "on and off" governor, and not merely a "throttling" governor, has been produced, the patentees have brought out a valuable device, entitled to liberal protection.

The vacuum cleaning principle is well understood. In the small electric or hand power machines the vacuum is created by a constant pull on the cleaning tool. A low vacuum is steadily maintained by an electric fan, a pump, or a hand-operated crank or lever, which operates continuously by sucking air through the cleaning tool. The system of the patent, however, is designed for use in hotels, large stores, or steamships, and is adapted to be used on different floors, and by a number of operators, at the same time. This requires a good deal of power in order to create the needed vacuum. As shown in the drawings and specifications, it consists of a suction pipe attached to a vacuum tank at one end, and on the other carrying an aspirator or ejector, having a blast nozzle or jet nozzle. This is connected by a pipe with a steam boiler or other fluid pressure (in practice, with a steam boiler), having a pressure of 70 to 110 pounds. When the steam connection is opened, the rushing of the steam through the nozzle sucks the air from the tank through the suction pipe bearing the aspirator, and thus creates a vacuum. It is necessary, however, to control, and maintain the vacuum pressure, since this will constantly rise, unless used up as fast as created by the operation of the cleaning tools; and this control is what is sought to be accomplished by the patentees.

This they try to do by an automatic governor. It has been already shown that the suction pipe has one end attached to the vacuum tank and carries at the other an aspirator or steam-operated ejector, by which the vacuum is created. In order to automatically control the vacuum by shutting off the steam from the aspirator when the vacuum gets too high, and turning on the steam when the vacuum gets too low, another pipe is attached to the vacuum tank at one end, and to the suction pipe at the other, and in this second pipe a cylinder and piston are placed, so that they are connected at one end with the vacuum pressure of the tank and suction pipe, and at the other with the steam supply by a pipe attached to the aspirator steam supply pipe. The cylinder and piston constitute the automatic governor, or valve. Normally the piston vests at the bottom of the cylinder, in a position to keep a steam valve open, and the steam rushes through this and over the aspirator, thus creating and constantly increasing the vacuum. The piston is held in this position by a long spiral spring; the former being made hollow so as to inclose the spring. If the piston is moved upward about an eighth inch, the steam port or valve will entirely close, and shut off steam from the aspirator; thus stopping further increase of vacuum. The design of the patent is to produce this upward movement by a vacuum pull in the cylinder above the piston head of sufficient force to overcome the downward pressure of the spring. This end of the cylinder being connected with the tank and suction pipe, when the rush of steam over the ejector has continued long enough to create sufficient vacuum pull to overcome the spring pressure and the friction and inertia of the piston, the latter is designed to rise suddenly and shut off the steam. Further creation of vacuum being thus stopped, when the pull lowers from use of the system, leakage, or both, to such an extent that the spring can overcome this pull, and the friction and inertia of the piston, the latter is designed to be suddenly forced down to its normal position, opening the steam valve again, and starting the aspirator. These results are what the patentees desired, and the operation of the piston thus described is called an "on and off control," as distinguished from a "throttling control," which is what results when the piston does not rise high enough to entirely shut off the steam, or descend low enough to entirely turn it on. It neither creates sufficient vacuum nor saves steam. Complainant insists that the patented governor creates an "on and off" control, while defendants insist the contrary, that it is only a "throttling governor," like many in the prior art. Upon this question the case turns.

As will readily be seen from the description, the vibration of the piston back and forth is caused by nearly equal forces opposed to each other, suggesting the gradually slowing pendulum. The power of these forces may be approximated, as follows: (1) Vacuum pull per mercury inch, 6 pounds, making the high vacuum point of 8 inches, 48 pounds, and low point of 5 inches, 30 pounds. (2) Spring tension, 35 pounds. (3) Piston weight, 4 pounds. (4) Spring weight, 1 pound. (5) Friction of rest of rising piston, 8 pounds; and of falling piston 4 pounds. Thus the total force necessary to raise the piston is, 48 pounds, exerted by the 8 inches of vacuum. On the

return trip, the 35 pound spring must overcome 8 pounds inertia of piston, less its weight of 4 pounds, leaving 31 pounds net spring tension; so the vacuum must fall to about 5 inches, or 30 pounds, before the piston will be reseated. The small factors of increased spring tension when the piston rises, and instantaneous lessening of vacuum when the steam is shut off are ignored because infinitesimal. The opposing forces being equal, why does not the piston balance, like a pendulum? Given 49 pounds pulling one way and 48 the other; or 31 pushing down and 30 pushing up, no very positive or energetic action would be expected. Apparently there would be no "snap action," no strong or decided movement. This result is what defendant's witnesses and counsel say is the inevitable action of the device, that its movement is so weak as to produce only a throttling action. Complainant maintains the contrary, and his theory is clearly stated by his expert, Mr. Carter, as follows: The on and off action is produced, "first, because the friction of rest is greater than the friction of motion, and tends to hold back the valve (piston) till the unbalanced pressure is considerable, and to then let it move clear over, when once started; second, that the inertia and momentum of the valve and directly connected piston exert a tendency in the same direction; third, that the spring is made so long that considering the slight movement (only an eighth of an inch in practice) permitted the valve the pressure exerted by the spring upon the valve is practically constant no matter whether it is in one position or another." Defendants contend that somewhere or somehow in the operation described by Mr. Carter there is lost motion; that, while the device can be made to work by suddenly opening and closing the handle valve in the sweeper, and under other limited conditions, yet the inevitable tendency, as shown in all the tests, is for the governor to throttle, and to assume a balanced position. Complainant denies this, though he admits that he does not use the device except with another called the auxiliary control or pilot valve. It appears in evidence that some form of auxiliary has been used by complainant from a time about two years antedating the issue of the patent down to the present, and that auxiliary controlling devices have been commonly used in mechanical operations for many years. The types employed by both parties operate by allowing the accumulation of a vacuum greater than necessary to move the piston, and then suddenly applying it, thus securing a positive off action, and by suddenly introducing atmosphere to the low point of the vacuum, while it is maintaining the "off" control, thus instantaneously breaking the vacuum pull, and permitting the full net tension of the spring to jump the piston back to its seat, and turn on the steam. It will be readily seen that such a vigorous and decisive result cannot theoretically be obtained by the patent governor itself, acting pursuant to its own principles, because the spring is always pushing and the vacuum always pulling, except, however, that a sudden opening of the vacuum pipe will instantaneously deplete the vacuum pull, and a sudden closing instantaneously increase it, thus causing such changes in the vacuum forces as to carry the pull above the 48 pounds on the one hand, and below the 30 pounds on the other, with

the forces all contained within the cylinder the vacuum cannot exceed 8 inches, nor be less than 5, other than as just stated. But by keeping the vacuum pull entirely out of the governor cylinder until a high limit of vacuum is reached, say of 9 inches or 54 pounds, and then allowing it to be suddenly applied, a positive off action is obtained, completely shutting off the vacuum production. On the other hand, by keeping the gradually lessening vacuum pulling against the spring until the low point is nearly reached, and then suddenly breaking vacuum by admitting atmosphere, a positive on action results. Even though the above estimates of weights, tension, and pressure are not accurate, it is manifest that nearly equal forces are constantly opposing each other leaving the margin either way quite small. Whether it is large enough to secure practical results is answered by the tests made, three of them witnessed by the trial judge. The final test most clearly demonstrated operativeness and utility in the patented device, notwithstanding theoretical objections and the unsatisfactory character of the first three tests.

The first test was made by Mr. Harrison in New York. The governor used was made from one of complainant's blue prints. His conclusions were that the governor, operating without the auxiliary or pilot valve, "could not be made to operate positively under uniform, or uniform varying, conditions of vacuum, * * * without tending to become balanced, so as to allow steam to flow continuously through same," also, that the governor would not operate, either with or without the auxiliary, without admitting air under the seat of the piston. The governor remained balanced for 15 minutes, with steam wasting, and, as there was no indication that it would change its position, the vacuum was broken by hand. This test is not conclusive, not only because "any device can be made to fail to work," many most valuable inventions have at first worked imperfectly, and the device was not made by complainant, and "no matter how many fail, if one succeeds, that is enough," as complainant's counsel correctly say. The real question is, Can any one make the device operate? If so, it is not inoperative. However, Mr. Harrison's testimony is important because it is a faithful description of the three-day test made later, with a device made by complainant.

Upon the hearing complainant was permitted to introduce further testimony. Mr. Raddatz, one of the patentees, was called, and produced a governor made under his instructions, introduced as Exhibit "O-six." It was constructed according to one of the blue prints in evidence. When it was tested, he says it operated with the on and off control; the steam being either turned on full or turned off entirely. The witness further explained why complainant's company does not use devices like O-six, saying it is by reason of the leakage from steam-condensation, which has to be taken away either by drain piping or dripping into a bucket, and because the vacuum in the upper end of the device draws over water and vapor into the vacuum reservoir, by which the dirt and dust are dampened. Mr. Raddatz then goes on to explain why the auxiliary control is used. It is to obtain a greater range of vacuum between the point where the steam is shut off and where it is turned on. The margin or

range due to the difference between the friction of rest and of motion is practically too small. It is desirable to increase this up to about 2 vacuum inches with the low point at 8 or 8½ inches and the high point at 10 or 10½, and in practice the difference of range is set at 3 inches. This differential is obtained by the auxiliary or pilot valve, without which the patent governor is not used. It is very undesirable to have the control work too frequently because there is a too rapid wear on the parts, "they might hammer." An aspirator cannot be controlled by throttling, but only by compelling it to work at full speed while in action, followed by a complete shutting off, cleaning work going on all the time. This test shows operativeness and utility, precisely as the final one did. After Mr. Raddatz had testified, a test of Exhibit O-six under complainant's supervision was made at the Great Northern Hotel in Chicago, at which counsel on both sides, Mr. Raddatz, Mr. Raymond (defendant's witness), and the trial judge were present. It was found that the device showed an on and off action when the handle valve of the attached sweeping tool was continuously wholly opened and wholly closed. The action of the governor, however, was somewhat erratic. It did not seem to correspond with any definite vacuum pressure as indicated by the vacuum gage needle, and showed no definite differential, margin, or range between high and low points. When the sudden opening and closing of the handle valve was stopped, the governor soon settled into a throttling position. Then the spring tension was changed, the on and off action again commenced, and continued for a short time, when the throttling again succeeded. The test being over, the hearing was resumed. This test showed operativeness, but was not satisfactory from the standpoint of utility.

After the hearing, a three-day test of exhibit O-six was made under defendants' supervision in the basement of the Marshall Field retail store, Chicago, Mr. Raddatz and Mr. Williams, one of complainant's solicitors, being present. The trial judge spent a short time witnessing this test on two days. The results were practically the same as those observed by Mr. Harrison, and at the Great Northern Hotel. The tests thus being unsatisfactory, a final one was had on June 2, 1910, at complainant's factory in Milwaukee, with a new governor, identical with Exhibit O-six. This test was entirely conclusive in showing the positive on and off action claimed by the patent. It continued for nearly 90 minutes, under all ordinary operating conditions. The governor worked perfectly all the time, and the test was entirely satisfactory from the standpoint of operativeness and utility. The device is novel and useful, being the first positive on and off governor ever produced. The patent should be sustained without hesitation.

The only remaining question is that of infringement, and, in order to a proper understanding of the question, some further description of the auxiliary valve is necessary, since defendant uses the patented governor only with the auxiliary. There are manifold forms of auxiliary controlling devices. Both parties use them without any claim that either is novel or patentable. Defendant's plan of con-

trol may be profitably described in order to see whether it infringes. Defendant's governor is an equivalent of complainant's, but having a weaker spiral spring, compressing about one-seventh of its length when the piston rises. This governor is actuated entirely through an auxiliary valve made integral with and immediately above it. When the high vacuum point of 10 inches is reached, the vacuum pull lifts a piston in the auxiliary device, which opens connection with the governor cylinder above its piston, to which no vacuum has been previously admitted. The sudden exhausting of the air in the cylinder forces up the governor piston, and cuts off the steam. The vacuum is then held in both the auxiliary and governor until it runs down to eight inches, when the weight of the auxiliary piston lowers it enough to admit atmosphere through a port of the auxiliary into the governor cylinder, breaking the vacuum and causing the piston to fall and open the steam pipe again. Whether the spring aids the performance is somewhat uncertain, though the drawings indicate that it does so. Defendant uses the patented governor, made in exact copy, except the lighter spring, but makes it more efficient by employing auxiliary control to increase the vacuum range and secure a more positive on and off action. The double device is an improvement on the patented governor but this does not change the established fact that defendant uses it, and thus infringes. Complainant himself uses a similar auxiliary, to obtain better results than would be possible with the governor alone. While the auxiliary slightly changes the operation by the sudden admission of vacuum, and its sudden withdrawal, yet the patented governor works by the operation of precisely the same forces whether the auxiliary is, or is not, used with it. This makes a clear case of infringement, notwithstanding an improved operation is obtained through the auxiliary.

Another point concerning the interest of the parties should be mentioned. After the case was argued and submitted, but before the final test in Milwaukee, counsel on both sides stated that complainant's business had been purchased by a corporation called the McCrum-Howell Company, and that the latter had made some arrangement by which infringing plants other than that of Streeter Bros. should not be disturbed. The price to be paid by the McCrum-Howell Company for complainant's patent rights depends upon the patent being sustained by the courts. So far as defendant's plant is concerned, no agreement exists which prevents the issuance of an injunction. Up to the time of the Milwaukee test, the case was defended with the utmost zeal and ability by solicitors for defendant, and Mr. Clarke was present at that test, and made every possible point which seemed necessary to its thoroughness. The Sanitary Devices Company, which installed the Streeter plant, and defended the suit, has indemnified Streeter Bros. against any loss or damage in this suit. There is therefore a substantial controversy left, without collusion, and because of the thorough contest made, and of the conclusions reached by the court before any of the transactions referred to had taken place, there seems to be no doubt that a decision should be made.

A decree will be entered as prayed in the bill.